### VAPOR BLAST MFG. CO. et al. v. PANGBORN CORP.

Civ. A. No. 4459.

United States District Court
D. Maryland.

Sept. 29, 1950.

Judgment Affirmed Dec. 30, 1950.

---

31. Suko v. Northwestern Ice & Cold Storage Co., supra, 166 Or. at page 571, 113 P.2d 209, 215.

J. Kemp Bartlett, Jr., of Baltimore, Md., and Howard A. Hartman, S. L. Wheeler and H. William Ihrig, of Milwaukee, Wis., for plaintiffs.

Joseph France, of Baltimore, Md., William F. Hall and Joseph Y. Houghton, of Washington, D. C., and Arthur G. Connolly, of Wilmington, Del., for defendant.

COLEMAN, Chief Judge.

This is a patent suit involving the use of fluid-borne abrasives to finish or polish surfaces of metals, with particular relation to polishing with such accuracy as to produce highly finished surfaces on parts having a very minute tolerance. There is only one patent involved. No. 2,462,480, issued February 22, 1949, to Arthur H. Eppler, on application dated January 8, 1944. While the patent embraces 21 claims, only two, Nos. 15 and 21, are in suit, the former being a method and the latter an apparatus claim. One of the plaintiffs is the patentee and the other, Vapor Blast Manufacturing Company, a Wisconsin corporation having its principal place of business in Milwaukee, is a licensee under the patent. The defendant, Pangborn Corporation, is a Maryland corporation having its principal place of business in Hagerstown, Maryland. To the charge of infringement it defends with a denial, and also with the charge that the patent is invalid because (1) anticipated by the prior art and (2) the two claims in suit are not sufficiently definite.

What is claimed for the patent may best be indicated by quoting the following from the patent specifications:

"A primary object of the invention is to use fluid-borne abrasives to finish or polish surfaces and to be able to control the finishing and polishing operation with such accuracy as to be able to produce a highly finished surface on parts having the most minute tolerances.

"Another object of the invention is to provide a new type of satin finish on metals, which has important advantages for bearings, and other purposes. In bearings the improved finish produced according to the method hereinafter to be disclosed holds an oil film in the bearing more satisfactorily than any other type of finish. Moreover, the finish has advantages quite apart from bearings in that it is very attractive and is rust resistant, and shows an increase amounting to as much as five to ten percent in tensile strength as compared with the same parts finished by other methods.

"An important object of the invention lies in the fact that the wide control possible in its use permits of every type of operation from the coarsest rough or deburring cut to the finish honing or polishing. As will hereinafter be more fully explained, the results achieved result from a novel method and apparatus using the abrasive in suspension in a liquid. I am able to deliver up to four to six times as much weight of abrasive material per minute as in any previous fluid-borne abrasive apparatus, at the same time controlling results so effectively as to be able to finish the most delicate parts.

"The abrasive comprises a liquid carrier having the abrasive material in suspension. In the past, liquids have been used as carriers for abrasive material, but in general the abrasives have been introduced into the carrier at the nozzle, and in no instance has the abrasive been in suspension in the carrier.

"In the sand blasting art the finest abrasive capable of effective use in an air blast has been of the order of 80 mesh, and all attempts to use a liquid vehicle or carrier for abrasives have involved the use of the same sorts of abrasives generally used in pneumatic sand blasting apparatus. I have discovered that by using finer abrasives or by using emulsifying agents, or by both of these procedures, I am able to maintain the abrasive in suspension so that with the entire mass of emulsion in constant circulation I am able to assure a substantially uniform distribution of the abrasive throughout the liquid vehicle.

"For the high degree of polishing, which is one of the outstanding achievements of the invention, the fineness of the abrasive exceeds anything previously thought usable in this art. As above pointed out, 80 mesh abrasive is the finest ordinarily used in sand blasting. The finest abrasives available on the market for use in lapping compounds and such other fine polishing work are about 650 to 700 mesh. This is the approximate fineness of talcum powder. The abrasives which I use in the practice of the present invention range all the way from 100 to 2500 mesh, the latter comprising an impalpable powder. The preferred range of sizes is from approximately 200 mesh to approximately 1300 mesh.

"The liquid vehicle is preferably water with chemicals added. In the apparatus disclosed I may, for ordinary work, use 50 pounds of abrasive in a dry state to 50 pounds of the aqueous vehicle. To the water I preferably add a rust inhibiting chemical, such as the product commercially known as Metrolux, which contains trisodium phosphate, sodium chromate, and a form of lime which contains boron."

The two claims in suit read as follows: "No. 15 (the method claim). A method of cleaning and polishing which comprises the suspension of a predetermined amount of abrasive particles in a predetermined amount of carrier liquid, circulating the liquid suspension of abrasive particles upon a predetermined path while maintaining the portions of liquid and abrasive approximately constant and maintaining the distribution of the abrasive approximately constant throughout the carrier liquid, and jetting portions of the circulating carrier liquid and abrasive against the surface to be cleaned or polished." No. 21 (the ap-

paratus claim) : "Polishing apparatus comprising a charge of liquid carrier and abrasive particles in suspension therein in approximately fixed proportions, a collecting sump, a work support above the sump from which portions of the treating charge will drain into the sump, a nozzle, an air supply connection to the nozzle, an emulsion supply for said nozzle including a circulatory system leading from and returning to said sump and intermediately in communication with the nozzle and means for pumping the said charge through the system to supply the nozzle with portions of the charge under pressure."

The method and apparatus called for by the above claims are obviously so interwoven that while the language of the two claims differs, it is appropriate to consider them together. And while the language in both claims may prima facie appear to involve a device that is rather complicated in construction and operation, when the technical phraseology is translated into more simple language neither apparatus nor method is actually complicated. Thus, what is called for by these claims may be more simply stated as follows: (1) a metal sump tank in which is placed in liquid suspension a predetermined amount of abrasive particles; (2) a circulatory system whereby this emulsion is pumped from the bottom of the sump tank through a pipe to a so-called supply tank above the top of the sump tank; two outlets from this supply tank, one leading from inside the lower portion of it, in the form of a supply line and referred to as the secondary circulation line, at the end of which is a nozzle supplied with a compressed air line through which the emulsion may be ejected, under pressure as desired, against the articles to be abraided and polished; and another outlet in the form of an overflow pipe, and referred to as the primary circulation line which extends from the supply tank into the lower part of the sump tank and through which the emulsion flows, by gravity, from the former to the latter tank. The purpose of this circulatory system is to insure constancy in the agitation and distribution of the emulsion, namely, constant agitation in the sump tank, and at the same time constant renewal of a supply of the emulsion therein as the emulsion is pumped therefrom up into the supply tank and expended through the compressed air nozzle in the abrading operation.

The defendant's device consists substantially of the same parts, constructed and operated in susbtantially the same way, except there is no supply tank from which the emulsion flows by gravity, as we have seen occurs in the Eppler device, the emulsion being replenished and kept in agitation in the sump tank by being pumped into the bottom of that tank by means of a cut-off from the line through which the emulsion is pumped from that tank and at whose end is the nozzle through which the emulsion is ejected in the abrading operation.

■ We are satisfied that these differences are not sufficiently material to avoid infringement. Obviously, whether the emulsion is drawn off the sump tank from the bottom, the top or from some intermediate part is a minor variation and does not go to the essence of the device. As for the other alleged difference, namely, that the Pangborn device does not employ a gravity supply tank, we likewise think that is not sufficiently material to enable the defendant to avoid the charge of infringement. Re-using the abrasive liquid instead of wasting it by running it off, involves no novel idea. Eppler's method is merely a resort to a well known idea, a simple equivalent of defendant's method of "recapturing" and re-using the abrasive fluid, and also helping to obtain the desired constancy and agitation, just as do variations in the pump pressure and in the pressure through or construction of the nozzle from which the emulsion is ejected. The Court has been greatly assisted by seeing models of the plaintiff's device operated in the courtroom during the course of the trial and has also had an opportunity to inspect one of defendant's full sized so-called Hydro-Finish Cabinets. For the foregoing reasons, the Court is satisfied that defendant's device does infringe both claims 15 and 21 of the Eppler patent.

We turn, therefore, to the question of the validity of the two claims of the patent,

Nos. 15 and 21, that are in suit. After careful examination of the three prior patents upon which defendant relies, i. e., British Patent to Mathewson No. 6446, applied for April 15, 1889 and granted November 23, 1889, the United States patent to Tilghman, No. 415,230, a counterpart of Mathewson, applied for March 16, 1889, and granted November 19, 1889, and United States patent to Schellenger, No. 2,022,481, applied for December 2, 1931, and granted November 26, 1935, we are satisfied that Mathewson does anticipate. This British patent discloses the same circulatory system that is embraced in the Eppler patent. The operation of both devices involves nothing but simple principles of physics. Throughout the presentation of the present case there has been a tendency on the part of counsel for plaintiffs to make the patented device appear much more intricate and novel than it really is,—that is, to give the impression that it embraces some miraculous invention. There is nothing of the sort here. The device has great utility or we would not be here, but the principles on which it is based are so common that, even if the so-called overflow pipe had been omitted from Mathewson there would be at least a question whether it might not be reasonably contended that Mathewson had already discovered what Eppler claims to have first conceived. But we do not have to go that far. The demonstrations given to the Court of plaintiffs' cabinet in actual, normal operation, clearly indicate that it and Mathewson's device are (1) substantially the same in construction, that is to say that any one of the several alternate constructions permissible under both Eppler and Mathewson mount up to the same thing; (2) they operate in substantially the same manner, and (3) they produce the same result in the same branch or field of the same art. In short, here we have a case where it is true, apparently, that Mathewson did not contemplate the intensive, varied uses to which the abrasive art has in more recent years become commercially and very profitably applicable; but he did disclose to the world a machine which will perform these very same modern operations in the same manner as does the Eppler device.

The Mathewson patent, which is designated as covering improvements in the ornamentation of glass and apparatus therefor, calls for the use of fine abrasives, preferably sand in very fine powdered form mixed with water so that it becomes fluid mud, in order to obtain a finish, as, for example, a frosty appearance. It calls for the material to be sufficiently fluid so that it may be pumped, which is done from a sump tank, in which a conventional reciprocating pump is located, to an overhead tank from the bottom of which runs a gravity flow line on the end of which is a compressed air nozzle through which the abrasive substance is ejected upon the glass to be abraded. From near the top of the overhead tank runs an overflow line down into the sump tank.

In this British patent a second step is also referred to, i. e., that of using fluoric acid upon the frosted surface of the glass subsequent to the use of the fluid mud abrasive blast. However, all of the claims do not call for this. For example, claim 3 merely reads: "In the frosting of glass by the sand blast, the use of a fluid abrasive mud in combination with the apparatus as herein shown and described." And the fact that Mathewson does disclose the same object sought to be attained by Eppler is shown by the following statement from the Mathewson patent: "The object of this invention is to increase the rapidity of the operation, to secure a finer kind of frosting than heretofore, and to provide apparatus for effecting the same. To this end, I use sand in the form of very fine powder (preferably as fine as flour), mixed with water or other liquid to form a fluid abrasive mud, which can be fed evenly and regularly. This mud is propelled or projected against the glass by a jet of steam, air, or gas, at considerable pressure, or the desired velocity may be given in any other known way."

The fact that Mathewson's method and apparatus were designed specifically for abrading glass does not exclude their appli-

cation to other uses in the same general field. Modern needs have greatly increased —in fact have made manifold,—the uses to which the abrasive art has become applicable.

Eppler states in his patent that "In the past, liquids have been used as carriers for abrasive material, but in general the abrasives have been introduced into the carrier at the nozzle, *and in no instance has the abrasive been in suspension in the carrier.*" (Emphasis supplied.) The Mathewson patent disclosure, fifty five years before Eppler's, proved, we believe, that this last statement of Eppler is not correct. In this connection it is significant that the Mathewson patent was not before the Patent Office when Eppler's application was before it. It is true that a related United States patent to Tilghman No. 252,979, of which Mathewson was assignor, issued in 1882, was cited as a reference to the Patent Office; as was also another related patent to Tilghman, No. 412,771, of which Mathewson again was assignor, issued in 1889. However, these two patents which relate to the art of sharpening and cleaning files and other similarly-toothed tools, do not make the same disclosures as to method and apparatus that the British Mathewson patent does. Another United States patent to Tilghman, No. 415,230, applied for and issued almost simultaneously with the British Mathewson, is, as previously stated, cited in the presented case by defendant as anticipating Eppler because largely its counterpart. This patent, like the British one, was also not disclosed to our Patent Office in connection with Eppler. Since, admittedly, its disclosure does not embrace as close similarity to Eppler as does British Mathewson, we see no need to consider it further. The same applies to the patent to Schellenger No. 2,022,481, which is, as previously noted, the third patent referred to by defendant as anticipating Eppler.

■ It is, of course, not necessary to have a new element in a given combination in order to make that combination patentable. You may have merely the same elements that have long been known to the art, but if operating in a different combination and performing something different from what had been previously disclosed, then this combination may be patentable, even though embracing no new elements. However, here we not only have all of the old elements in the same combination as found in Mathewson, but that combination produces the same result. The mere application of an old combination to a new and analogous use does not amount to invention. See Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 324 U.S. 320, 321, 65 S.Ct. 647, 89 L.Ed. 973; General Electric Co. v. Jewel Incandescent Lamp Co., 326 U.S. 242, 66 S.Ct. 81, 90 L.Ed. 43; Mandel Bros., Inc., v. Wallace, 335 U.S. 291, 69 S. Ct. 73, 93 L.Ed. 12. A fortiori where, as here, we have the same use and the same result flowing from old elements in the same combination, the very essence of invention is lacking.

■ We are not unmindful of the fact that the point has been stressed on behalf of plaintiff that the pipe in Mathewson leading from the overhead tank down to the sump tank is not really a part of the specified circulatory system, but is embraced in the drawing of the patent and referred to in the specifications merely as an emergency device to avoid overflow from the overhead tank. However, even if we assume this to be true, this pipe does return the abrading liquid from the overhead supply tank back to the sump tank, from which it is again forced back into the circulatory system and used for abrading purposes. Thus, even though Mathewson may not have contemplated the same value to be attached to such a pipe as did Eppler, he did disclose it in form and in operation as Eppler has done and therefore, it is not to be ignored in determining the similarity of the two devices. It is not invention to perceive that something discovered by others had qualities that they may have failed to detect. General Electric Co. v. Jewel Incandescent Lamp Co., supra; Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610.

■ As respects the remaining ground of defense to the charge of infringement, namely, that the two claims in suit are not

sufficiently definite, we are satisfied that the contrary is true. But, in any event, in view of our finding that Eppler is anticipated by Mathewson, this point becomes immaterial.

Summarizing our conclusions they are: (1) Defendant's device infringes both of the claims of the Eppler patent in suit, numbers 15 and 21; (2) these claims are sufficiently specific in the light of the specifications; but (3) they are invalid because anticipated by the prior British patent to Mathewson.

A decree will be signed in accordance with this opinion.