CINCINNATI CAR CO. v. NEW YORK
RAPID TRANSIT CORPORATION.

District Court, E. D. New York.   July 19,
1928.

Toulmin & Toulmin, of Dayton, Ohio (H.
A. Toulmin and H. A. Toulmin, Jr., both of
Dayton, Ohio, and C. C. Daniels, of New
York City, of counsel), for plaintiff.

Knight Bros., of New York City (Harry
E. Knight and William E. Knight, both of
New York City, of counsel), for defendant.

INCH, District Judge.   This is a patent
suit.   Plaintiff is the owner of three patents
and claims that defendant has infringed each
and all of them.   These patents are Elliott,

No. 1,499,510 (U. S.) applied for February 8, 1923, patent granted July 1, 1924, Ellis No. 1,500,118 (U. S.), applied for December 14, 1923, patent granted July 8, 1924, and Elliott, No. 1,501,325 (U. S.) applied for December 14, 1923, patent granted July 15, 1924.

These patents were all duly assigned by Elliott and Ellis to the plaintiff, and there is no dispute about the ownership.

Elliott thus applied for his first patent (No. 1,499,510) early in 1923, and before a patent was granted he applied for another patent (No. 1,501,325) in the latter part of 1923, so that his applications were copending at the time he received his final patent papers on either.

Ellis, the other inventor, is the chief engineer of plaintiff and has been with the plaintiff for many years.

While these applications of Elliott were thus copending and a few days after Elliott applied for his last patent, Ellis applied for his patent. Elliott received his first patent July 1, 1924, Ellis obtained his patent a week later, and Elliott received his second patent a week after that. All these patents relate to the same subject. Before discussing the patents and the alleged infringement it may be helpful to consider what was the problem facing Elliott and Ellis.

The earliest application is that of Elliott (February, 1923). There is no issue on the question of prior date of the invention.

The problem of making one car out of two or possibly three in the transportation of passengers had occupied the minds of railway engineers for many years prior to 1923. Apparently the original idea was not so much to make additional accommodation as to afford protection to passengers in passing from one car to another; especially, if not almost entirely, in regard to steam railway transportation. This was accomplished by the familiar bellows type of connection between two cars. Later, and generally speaking, this idea of connecting two cars was applied to the transportation problem in general by Raymond, who applied for a patent in October, 1887, and received his patent January 24, 1888, No. 376,907.

Raymond may be said to have disclosed a new idea; that is, instead of "coupling the cars one to another, he mounted the cars upon double trucks." This double truck could be consolidated or closely joined and was adapted to pivotally support the ends of adjacent cars, and in connection with this arrangement he had steps leading to a platform supported at this joined end so that he made one car out of two cars by having wheels at the forward end, wheels at this middle part, and wheels at the rear ends of this combined car. This was all very well and was a step in the art, but its application, practically, to street car and subway car transportation, was without value.

Some years later and in 1920 there was presented what is termed the Milwaukee articulated unit. Here we have the same idea of the elimination of the unnecessary trucks and wheels of separate cars and a center coupling assembly between two cars, but the "vestibule" idea at these coupled ends was far from being perfected. Nevertheless a three-truck two-car street railway train was put into operation successfully. This also was a step in advance. The street railway engineers, however, were quick to appreciate not only the general idea but the utility of this combination of trolley or subway car.

Colby, superintendent of equipment for the city of Detroit, department of street railways, testifies about articular cars in comparison with the standard trolley car: First, the first cost of the units or parts; second, the lower operating cost expressed in power saving in connection with the weight, then car maintenance saving; and, finally, the avoidance of the cost of men employed to run and operate the car. There are other advantages also mentioned by him such as the speed at which such a unit can be loaded. "The doors are opened and the people can immediately get into an articulated train without hesitating to see which car is less filled than the other. They can get in knowing that they can circulate freely from one car to the other." He then mentions that the riding qualities are good; that the track space is small; that there is a sense of security given to the passengers. These statements of Mr. Colby are supported by actual results in dollars and cents. Mr. Colby stated he was not familiar with the Milwaukee system.

It also appears, and naturally so, that as early as January, 1922, this problem was being looked into by the defendants who were charged with the operation, in the city of New York, of surface and subway cars. This was almost 2½ years prior to the Elliott and Ellis patents.

There is no issue here and no claim made that defendant's articulated cars were produced prior to the dates of the inventions of Elliott and Ellis; but these facts are mentioned simply for the purpose of showing that railway engineers of great cities were alive to this problem and that entirely independent of plaintiff they were seeking im-

provements by experiment and study of their respective problems.

Thus it appears that the problem sought to be solved by Elliott and Ellis was not only an important one, but related to improvements of extreme utility, and that defendant's position is not similar to one simply copying an invention of something unheard of before that time and then claiming either no invention therein, or no infringement thereof.

Before discussing the real issue which must be based on comparison of the patents of plaintiff and the construction of defendant, it may be well to mention briefly certain other matters related to this controversy and which, in a way, make up the entire picture presented by the record.

There is some testimony that before the patents were granted to Ellis and Elliott, defendant's engineers visited plaintiff's shops and were there shown blueprints, etc., in the hope of possibly interesting the defendant, which was known to be considering this problem of articulated cars, and therefore a possible buyer of plaintiff's construction, and these ideas were voluntarily shown defendant's representatives along that line. From this the inference is sought to be raised by plaintiff that defendant utilized this information to invade plaintiff's rights.

■ Aside from the difference in construction and principle between the structures of plaintiff and defendant to which I shall hereafter refer and that indicate that no such thing happened, I fail to find any proof directly or even by inference that defendant's engineers took unfair advantage of this voluntary display. "It is well settled that a man cannot have a patent for the function or abstract effect of a machine, but only for the machine which produces it." Corning v. Burden, 15 How. (56 U. S.) 252, page 268 (14 L. Ed. 683).

■ What defendant's engineers were looking for was a commercial article applicable to their problems whether in the making or finished. They would have, of course, no right to copy the ideas of Elliott or Ellis, but they would have the right to consider these ideas and avoid infringement if possible. This right has been stated by the Supreme Court in the following language: "Every man has a right to make an improvement in a machine, and evade a previous patent, provided he does not invade the rights of the patentee." Burr v. Duryee, 1 Wall. (68 U. S.) 531, page 574 (17 L. Ed. 650).

All of the patents relied on by plaintiff are improvement patents, and not only is a person presumed to know the prior art, but progress in the art is advanced by actually knowing what the prior art is and carefully considering same.

I am satisfied therefore that there is nothing in this charge of plaintiff, and that defendant's engineers were working out, in good faith, their own solution of their own particular problem, and that now that this has proved to be commercially successful the issue is properly raised by this suit whether or not Ellis and Elliott have been granted an exclusive monopoly over such ideas and construction. Have plaintiff's patents disclosed sufficient to prevent defendant from now using its own construction which was likewise subsequently patented (Brinckerhoff, No. 1,642,869 [U. S.] applied for March 21, 1927, granted September 20, 1927, Defendant's Exhibit L 4), unless satisfaction to Elliott and Ellis in the form of purchase or royalty is first obtained?

In other words, the issue is whether defendant has invaded the rights of these patentees and not whether defendant has evaded such rights.

■ The next thing that should be mentioned is, I fail to find any fraud, even if same could be raised by the pleadings here,. in connection with the patents of Elliott, and I find no difficulty in construing all of the patents of plaintiff together, although defendant insists that it cannot be done. Nor, as defendant contends, do I find any reason to hold that the first Elliott patent anticipates the second. The claims are not duplicated, and the applications of both Elliott and Ellis were all copending. Benjamin Electric Mfg. Co. v. Dale Co. (C. C. A.) 158 F. 617, Century Electric Co. v. Westinghouse Electric & Mfg. Co. (C. C. A.) 191 F. 350. Nor is the situation similar to that in the National Electric Ticket Register Co. v. Automatic Ticket Register Corp. (C. C. A.) 15 F.(2d) 257, where the inventor put his first device on the market and three years afterwards made his second application. The applications were not copending. See, also, Vapor Car Heating Co. v. Gold Car Heating & Lighting Co. (D. C.) 296 F. 188.

■ Finally, it appears from the record that the plaintiff's articulated car is designed for street railway service. There is no proof that it has been used in subways such as those of New York. The construction of defendant is being used successfully in the subway system of New York.

As bearing on the problem of defendant this may not be overlooked although it alone

gives no right to defendant to invade the rights of plaintiff if an invasion is proved.

Plaintiff, through itself and its licensees, has invested a large sum of money in its street cars, while defendant has invested a much larger sum in its cars.

Plaintiff's licensees have put on the street railway tracks of various cities successfully operated articulated cars of plaintiff's design. Washington, D. C., has ten trains, Baltimore thirty-two trains, Chicago one unit, and Detroit one unit. Perhaps there have been more. This is only mentioned to show that plaintiff's inventions are a successful improvement. On the other hand, a street car runs on perfectly flat rails, the cars are relatively light, and are not usually run at extreme high speeds; nor is the safety factor the same.

In the subway service in the city of New York, the record shows, cars are subjected to great lateral strain and tremendous thrusts of the sections against each other. The principal problem, however, is the negotiation of reverse superelevated curves and the handling of the cars over the bridges and into the tunnels with its heavy grade. The extreme superelevation is 5 inches to 33 feet. The trains have a running speed of 44 miles an hour with the maximum speed of 53 miles; the weight of a three-section unit is approximately 210,000 pounds, and a train is composed of four of these three-section units. The carrying capacity for such a train is 2,200 passengers, which, taking the average weight of a passenger at 150 pounds, makes the total weight of such a train, when loaded, over 1,000,000 pounds. It goes without saying that at most times the trains are loaded.

The problem of the defendant therefore was to produce an articulated car under such conditions which would prevent distortion of the car members or the truck members while operated with a reasonable degree of maintenance and the highest degree of care for the safety of its passengers.

The plaintiff's position on its patents, broadly stated, is that "it makes no difference whether the defendant's construction has a vestibule that overlaps the so-called platform or car body or whether it touches it or not; it makes no difference whether the double trunnions are in a common socket or two sockets or whether they turn on the same center or on centers that are a few inches apart. * * * The two fundamental features of the Elliott and Ellis patents are a stiff vestibule moving in unison with a supporting truck and adjacent car

bodies, each with its own trunnion pivoted upon a common truck bolster. Both of these are in defendant's construction, and therefore all other questions are moot for infringement is present solely and simply because of the presence in defendant's construction of these two essential and fundamental features. The question as to the safety strap, whether it prevents the trunnions from leaving the socket or whether the springs in Ellis' maintained the vestibule vertical, are merely supplemental questions." Plaintiff's Brief, p. 12.

I have mentioned this excerpt from plaintiff's excellent brief before discussing the patents in order to show that apparently plaintiff contends that any other improvement, however better adapted it is to circumstances and conditions such as are shown to exist on defendant's lines, nevertheless must be "equivalents" and therefore invade the rights of Elliott and Ellis.

None of plaintiff's patents is a "pioneer" patent. They each relate to "improvements." The individual elements of the combination are old. It is the combination that is new.

█ The conditions of defendant's problem cannot be entirely lost sight of. The rights of the public to have safe and adequate transportation on their subways is most important. It has been said: "The benefit to the public or community at large is another and doubtless the primary object in granting and securing that monopoly" (that of a patent). Kendall v. Winsor, 21 How. (62 U. S.) 322, 328 (16 L. Ed. 165). "It is the reward stipulated for the advantages derived by the public." Grant v. Raymond, 6 Pet. (31 U. S.) 218, 240 (8 L. Ed. 376). "The franchise which the patent grants, consists altogether in the right to exclude everyone from making, using, or vending the thing patented without the permission of the patentee. This is all that he obtains by the patent." Bloomer v. McQuewan, 14 How. (55 U. S.) 539, 549 (14 L. Ed. 532).

If therefore defendant's solution of its problem is the same as or the legal equivalent of plaintiff's disclosures, the plaintiff must prevail however such decision may affect the rights of the traveling public served by defendant. If defendant's construction is different from and not the equivalent of plaintiff's patents, there is a reason for such difference in the requirements of defendants' service as well as in the fact itself. Let us now take up the patents of plaintiff.

█ The first patent is that of Elliott, No. 1,499,510 (Plaintiff's Exhibit 2), applied for

February 8, 1923, and granted July 1, 1924. It relates to an *improvement* in railway cars. Plaintiff relies on claims 1 to 6 and 9 to 11 of this patent. These claims are as follows:

"1. The combination with two adjacent cars and a supporting truck common to both cars and to which they are articulated, of a vestibule unit comprising a separate closure adapted to ride on the adjacent platforms of such cars and supported on said truck through the intermediary of said platforms, and having doorways through opposite portions of the side walls.

"2. The combination with two adjacent cars each having a projecting platform and a truck common to both cars and to which each platform is articulated, of a vestibule overlapping such platforms, supported thereby and positioned above the point of articulation between the platforms and truck.

"3. The combination with two articulated cars of a vestibule unit comprising an enclosure overlapping the adjacent platforms of the cars and having a connection with the truck bolster to cause the vestibule unit to move in unison with the bolster to keep it properly positioned with respect to the cars as they change relative position on curves.

"4. The combination with two articulated cars mounted on a truck common to both, of a vestibule unit comprising an enclosure positioned to partly rest on each platform and devices which connect the vestibule with the bolster for the purpose stated.

"5. The combination with two articulated cars mounted on a truck common to both, each car having yieldingly mounted guards, of a vestibule comprising an enclosure positioned to partly rest on each platform and to make contact with said guards and means for connecting the vestibule with the bolster of said truck.

"6. The combination with two articulated cars mounted on a truck common to both, each car having yielding guards, of a vestibule unit comprising an enclosing structure of cylindrical form adapted to contact with said guards and also adapted to overlap the adjacent platforms of said cars."

"9. The combination with a truck bolster, of a vestibule unit comprising an enclosing structure and means for connecting the bolster with said vestibule to cause the latter to move in substantial unison with the bolster when deflected by the course of the tracks.

"10. The combination with a truck bol-

ster, of a vestibule unit mounted above the bolster and means for detachably connecting the bolster and the vestibule, such means being adapted to cause the vestibule to move in substantial unison with the bolster when the bolster moves about its center.

"11. The combination with a truck bolster, of a vestibule unit comprising an enclosing structure of cylindrical outline, and adjustable rods operable in the vestibule causing them to connect and disconnect the vestibule with the bolster."

Elliott says: "The special feature to which my invention is directed is the provision of a structure in the nature of a vestibule which comprises an enclosure independent of the structure of the cars and which is adapted to be mounted on the platforms of adjacent cars to form a safe housing through which passengers may pass in going from one car to the other." Lines 13–21, p. 1 of patent. He then goes on to state that this vestibule is a separate unit, and describes its combination with the adjacent ends of the cars and a common truck for both ends of the joined cars.

Unfortunately for Elliott, he thought he had solved the problem by placing this independent vestibule on the platform of these two joined cars. This did not work. Ellis, a witness for the plaintiff, conceded that no car was ever built that way by plaintiff; that a little after the first of 1923 it was abandoned. "When we got to work on the drawings we saw the thing was not going to work out so well resting on the floor due mostly to the chance of tripping and things of that kind, just as you would have if your drum came up above the floor and when going over a break in grade, it was a matter of safety."

There was no invention in the form of a circular drum or vestibule over a square one; in fact Elliott states: "Some other shape or outline than cylindrical may be used." Lines 35–37, p. 2 of patent.

The plaintiff therefore put this idea of Elliott temporarily aside, as it would not work. Elliott, however, apparently did not abandon his idea, but endeavored, and apparently successfully, to make this idea of his useful by a different combination, to wit, the support for his drum or vestibule. This will be more fully discussed when I come to his second patent, No. 1,501,325, for which he applied about ten months later.

In the meantime Ellis, of the plaintiff's employ, was working on this problem, and he produces his new idea in his patent No. 1,500,118 (Plaintiff's Exhibit 3). This in-

vention also relates to an *improvement* "in railway cars, more particularly to means for preventing the side sway of articulated cars; that is cars whose adjacent ends are supported by one truck common to both cars." Lines 10 to 15, p. 1 of patent.

Plaintiff asserts that claims 1, 2, and 7 of this Ellis patent have been infringed. These claims are as follows:

"1. In a railway car, the combination with a truck bolster and cars articulated thereon, of a vestibule partly positioned over the platforms and partly over the bolster, and resilient side bearings acting between the bolster and the vestibule to cause the vestibule to resist swaying movements or tendencies of the platforms.

"2. In a railway car, the combination with a truck bolster and the platforms of adjacent cars articulated on the bolster, of a vestibule forming a passageway from platform to platform, overlaying parts of each platform and at intermediate portions overlaying the bolster, and resilient side bearings including springs which act downward on the vestibule to cause it to resist side-sway movements of the platforms."

"7. In a railway car, the combination with a truck bolster, side bearings carried thereby, and two adjacent car platforms, a pivotal connection between each platform and the bolster and a vestibule positioned to overlap the adjacent portions of the platform and to extend over the side bearings on the bolster, whereby a four-point contact is provided, two points between the platforms and the bolster and two other points between the vestibule and bolster."

Ellis' first object was to substitute for the support given in an individual car by the side bearing on the bolsters of the trucks something that would in the same way limit the rolling or side sway of the car. In other words, it seems to me that, having before it the disappointment of Elliott, the brain of Ellis was put to work by plaintiff to stop the car platform from making useless Elliott's drum vestibule which rested upon it, and so he conceived his idea of springs, as he calls them, "resilient side bearings," mounted on the truck bolster, at points under the vestibule or drum, adapted to hold the vestibule from swaying laterally and thereby to cause the vestibule *to check the lateral swaying of the car body.* The vestibule overlaps the platforms of the cars so that the resistance the side bearings offer against side swaying of the vestibule is thus transmitted to the car platform through the vestibule." Lines 34 to 43, p. 1 of patent. (Italics mine.)

This Ellis idea therefore has means consisting of springs and bolts which pass through the vestibule floor and through appropriately arranged brackets on the truck bolster; the vestibule floor in turn rests upon ends of the associated platforms, thus forming an inverted form of side bearing.

The ordinary form of side bearing in railway cars consisted of plates engaging corresponding plates whenever a car body tilted for any reason, the plates being attached to the ends of the truck bolster and car body respectively. The Ellis system is an inversion of this construction. Ellis therefore by means of springs and the floor of his vestibule endeavors *to check the side sway of the car body.* He resisted it. He used the Elliott vestibule as a side bearing. His whole purpose was to control the side sway of the car bodies and to oppose such sway. This apparently works in ordinary street railway cars, but it is not defendant's construction. It would not work on the subway system of defendant with its super-elevated curves.

The third and final patent is that of Elliott, No. 1,501,325 (Plaintiff's Exhibit 4), applied for December 14, 1923, and granted July 15, 1924. Plaintiff asserts that all seven claims of this patent have been infringed. These claims are as follows:

"1. In a railway car, the combination with a truck bolster, and two adjacent cars, of a plurality of pivot trunnions and a corresponding plurality of sockets therefor, each car having one trunnion and one socket assigned to it.

"2. In a railway car, the combination with a truck bolster, and two adjacent cars, of a plurality of pivot trunnions and a corresponding plurality of sockets therefor, each car having one trunnion and one socket assigned to it, and a locking device adapted to restrain either trunnion from displacement from its socket.

"3. In a railway car, the combination with a truck bolster, and a base plate having sockets, of two adjacent cars, each having a pivot trunnion secured thereto and adapted each to occupy a socket.

"4. In a railway car, the combination with a truck bolster and a base plate having sockets, of two adjacent cars, each having a pivot trunnion secured thereto and adapted each to occupy a socket, and a locking device comprising a removable member adapted to engage with the trunnions and prevent their withdrawal from the sockets.

"5. In a railway car, the combination with a truck bolster and the platforms of two railway cars each projected over the bolster, of a socket base plate and a pivot trunnion for each platform, said trunnions being adapted each to enter one of the sockets.

"6. In a railway car, the combination with a truck bolster and two car platforms each projected over the bolster, of a socket base plate secured to the bolster and two trunnion plates secured one to one platform and the other to the other platform and a pivot trunnion carried by each trunnion plate.

"7. In a railway car, the combination with a socket base plate having sockets therein, of two pivot trunnion plates, each having a trunnion adapted to fit each in a socket, the trunnions having shoulders, and a locking bolt mounted in the socket plate and adapted to engage with said shoulders to prevent either trunnion from displacement."

In view of Elliott's previous idea already mentioned and its apparent lack of utility and while Ellis had been working out his system of springs which might in combination make it useful, Elliott had also been working out his idea in still another form, and applied for a patent thereon December 14, 1923. He received the patent July 15, 1924. This in my opinion is the important patent of the suit, for he is combining naturally all the strength of his former patent and that of Ellis, not of course, in technical form, for each of the patents must stand or fall by themselves, but as a practical matter. Elliott describes this last invention of his as an *improvement* in railway cars relating "particularly to the double pivotal connection or articulation of the car to the bolster of a truck common to two adjacent cars." Lines 11 to 14, p. 1 of patent.

Fig. 2 of this patent is in many respects identical with Fig. 3 of Ellis with the important and new ideas which are submitted. This new idea of Elliott is the discovery that he could arrange two independent pivotal supports by which both cars would be given perfect freedom to change their relative position, that is, to sway or move horizontally as when going over a hill or at the dip of same, and this is given as his principal object. Other objects were the provision of a double socketed base plate with one trunnion for each socket and means for preventing either of the trunnions from getting out of its socket.

As I have already pointed out, none of these patents of Elliott or Ellis represent pioneer invention; they are steps in the art, and however useful and important they may be they represent combinations of old elements, the invention being in the new result. There was nothing new about joining two cars together; there was nothing new about having a central point or pivot; there was nothing new about having springs to exert pressure where pressure was needed.

In substance, Elliott's idea in his last patent is that of a double or plurality of pivot trunnions, each of the trunnions fitting into a separate socket and being held there by a locking bolt adapted to prevent displacement of the trunnion.

We have therefore in these three patents of Elliott and Ellis a construction which discloses a vestibule resting on the platforms of the joined cars, exerting by means of springs a resistance against the side sway of the cars, and thus maintaining its vertical position, with two independent pivotal supports represented by independent trunnions each in its own socket, with a lock bolt to prevent a displacement of the trunnion. This of course is but a general description made for the purpose of discussing the defendant's alleged infringing construction.

In defendant's construction the vestibule is poised upon the center of a truck bolster by a central pivot. It is not mounted on the platforms. In defendant's there are no platforms. The end is cut away in a curve. The brackets about which so much is made are not used as supports but as something to be used in disassembling the unit. There is a space between these brackets and the floor of the vestibule when the car is being used. The vestibule is maintained in a vertical position by four springs placed at the top of the vestibule; the endeavor of defendant is *to allow the sway of the side of the car* and at the same time have this sway keep the vestibule vertical. It is the opposite idea from Ellis in this regard, who seeks to prevent sway by pressure of springs. Defendant seeks to utilize the sway by means of springs. The result may be the same, to wit, a vertical vestibule, but the means employed are opposite, and one may work on a street railway but be inoperative on the subway with its uneven and superelevated track. Thus, in addition (as I have said), the vestibule of defendant does not rest on the platform—a construction plainly different from that of Elliott.

Defendant's truck, carrying the adjacent ends of the two car bodies, has a segmental form of arrangement, in which the center plate or trunnion of the associated cars forms the segment of a circle and rests in a common bore or truck center. They are so de-

signed that gravity brings their faces *in contact and they remain in contact.* Thus where a sharp thrust, so often encountered on defendant's railway, is imparted to one end of a car, it will be transmitted *through the center sill of the car,* to which the center plate is attached and without transmitting the shock of the impact *through the individual trunnions,* as would be the case in Elliott's. In other words, the shock would be transmitted and absorbed throughout the length of the car and not down through the trunnions resting in separate sockets which are not in contact and where such impacts would tend to bend or break them, with disastrous results. In defendant's structure the shock passes through a horizontal plane.

A comparison between plaintiff's structure and defendant's structure can be best visualized by comparison of Plaintiff's Exhibit 28 and Plaintiff's Exhibit 29.

Here again the result of an adequate articulation may be accomplished by the two different ways arrived at. One is adapted to one kind of traffic; the other is better adapted to another kind.

The distinguished expert for plaintiff, Dr. Wagner, is of the opinion that the two constructions are substantially alike, with minor unimportant differences, but even then, it seems to me, that this identity, if any, must exist on the theory of equivalents if identity is to exist.

There are weather strips connected with the vestibule of both Ellis and defendants. Ellis' patent, however, does not cover weather strips, and his claims must be limited to their plainly expressed purpose.

Dr. Wagner believes that the defendant's supplementary springs operate against the side sway of the car, but the record shows that this does not take place when the car is in motion, and at such time the vestibule can be freely moved without effect on the car.

The locking bolt of Elliott functions to keep the trunnions in their sockets. The safety strap of defendant allows the center plates or trunnions to be removed without disturbing it. It is there for a different purpose, to wit, to supply a purely safety emergency measure for holding the cars together should a center plate give way.

It must not be overlooked that each one of the articulated units of defendant's trains necessarily has four 200 horse power motors located on each of the four trucks, the force from which may and often does result in heavy shocks throughout the under train connections. Also that an opening in a car floor in a New York subway might become of most practical disadvantage instead of being purely theoretical in some other form of street railway service. Also that to build trunnions for cars of defendant's required weight and duty in accordance with the structure of Elliott would be impossible according to the engineers of defendant (and apparently this is undisputed) unless the centers because of their size, etc., were located approximately ten inches apart, which in turn would make impossible the use of the present trucks without increasing the wheel base, etc. In effect plaintiff's construction is not adapted to a subway service such as defendant's.

As I have already stated the Patent Office has granted Brinckerhoff, of defendant, a patent covering his segmental form of center plate and this in spite of the prior existence of the patents of Elliott.

There is therefore a distinct difference in my opinion in construction between the improvement combination of Ellis and Elliott and of defendant.

From the careful and excellent briefs of both counsel the controversy seems to be more on the theory that the patent disclosure and defendant's construction is identical, as shown by the excerpt from plaintiff's brief quoted at the beginning of this opinion, and, on the other hand, that they are so different as not to be even considered alike, as claimed by defendant's counsel in their brief, where it is said as to plaintiff's claim "that it makes no difference," etc. The claim that the first Elliott patent makes to invention "is limited to a structure in which the vestibule is mounted upon and overlaps the car platforms. The claims of the second Elliott patent are all specifically limited to a plurality of sockets upon the truck bolster to receive a plurality of trunnions. Ellis' whole purpose was to control the side sway of the car body by means of spring side bearings while in defendant's structure there is no effective engagement between defendant's vestibule and the car body."

The argument of plaintiff therefore seems to take it for granted that any construction that has a vestibule independently mounted will infringe the Elliott and Ellis patents.

The doctrine of equivalents in relation to the interpretation of claims of patents is not always easy to apply. It has been stated: "There are two groups of decisions relating to the claims of patents which appear to be diametrically opposed." See the interesting address of Edwin J. Prindle, before the American Bar Association, at Boston, Au-

gust 30, 1911. Mr. Prindle comes to the conclusion that there is no real conflict between the reasoning of the two groups of decisions, but that the apparent conflict arises in the use of general language in discussing a case when considered without reference to the facts of that case and the actual result arrived at. An example of one side of this controversy is given, among many others: "Some persons seem to suppose that a claim in a patent is like a nose of wax which may be turned and twisted in any direction by only referring to the specification, so as to make it include more than, or something different from what the words expressed." White v. Dunbar, 119 U. S. 47–51, 7 S. Ct. 72, 74 (30 L. Ed. 303). An example, among others, of the other side of the controversy is: "It is true that he calls for clamping plates in his claim and that he does not claim any other method in making his connection. But he does not show any intention to confine himself to that specific mode of connection. The form he describes and claims is not of the essence of his invention, and the law allows the patentee any form which is equivalent to the one claimed unless he has expressly limited himself to the one claimed and described, or unless it is necessary to limit him to the specific form in order to save his patent from anticipation." McSherry Co. v. Dowagiac Co. (C. C. A.) 101 F. 716–722. The above decision was written by the late Judge (Justice) Lurton, together with the then Judges Taft and Day. The Supreme Court later denied a writ. 179 U. S. 686, 21 S. Ct. 918, 45 L. Ed. 386.

The plaintiff's patents are each for an improvement. The elements of the combination are old. The invention consists of a new combination and new result. The inventors of plaintiff are not pioneers but are improvers. The broad rule of equivalents is accordingly narrowed, and the endeavor of the court in such cases is to reasonably apply the rule of equivalents so as not to unnecessarily devitalize the patents. Authority is not lacking for the application of a reasonable rule in such cases as this.

"The argument used to show infringement assumes that every combination of devices in a machine which is used to produce the same effect, is necessarily an equivalent for any other combination used for the same purpose. This is a flagrant abuse of the term 'equivalent.'" Burr v. Duryee, 1 Wall. (68 U. S.) 531, 573 (17 L. Ed. 650).

"But if the invention claimed be itself but an improvement on a known machine by a mere change of form or combination of parts the patentee cannot treat another as an infringer who has improved the original machine by use of a different form or combination performing the same functions. The inventor of the first improvement cannot invoke the doctrine of equivalents to suppress all other improvements which are not mere colorable invasions of the first." McCormack v. Talcott, 20 How. (61 U. S.) 402, 405 (15 L. Ed. 930).

As I have said, the Elliott and Ellis patents are improvement patents. There surely is no mere colorable invasion of plaintiff's rights by defendant's construction. A court can properly and carefully consider, in such cases as this, facts showing any real necessity for a different construction. It is plainly indicated from this record that the disclosures of the plaintiff's patents would be unsafe and inoperative on defendant's subway system.

But aside from such incidental questions of necessity which might be litigated and disputed and would lead one from the real issue presented, I prefer to base my decision on the finding that the defendant's construction is not the equivalent of the patented combination. There is a substantial difference, and this difference is honestly and fairly shown. The fact that there is a good reason for there being a difference may be considered immaterial so far as this decision is concerned.

Although I have read same it is not necessary to discuss the various patents offered by defendant as to the prior art such as the Way patent No. 141,207, the German patent No. 135,392, the Rounds patent No. 884,420, the Cooper patent No. 566,710, the Lindall patent No. 110,394, and others, as they all seem to be inapplicable to a combination such as we are here discussing.

Accordingly, while I have no hesitation in holding the Ellis and Elliott patents valid, although there may be some discussion as to the validity of the first Elliott patent (Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U. S. 358, 48 S. Ct. 380, 72 L. Ed. 610, April 9, 1928), yet it seems to me, in comparing these patents with the construction of defendant, that the latter is somewhat different in principle and is different in construction and is not an equivalent and therefore not covered by the patents of plaintiff. On the contrary, defendant's construction is an improvement better adapted for use on the kind of railway defendant uses.

Therefore the valid patents of plaintiff

have not been infringed by defendant, and the complaint alleging such infringement must be dismissed.