ALUMINUM COLORS, Inc., v. UNITED STATES RESEARCH CORPORATION & TECHNICAL METAL FINISHING CORPORATION.

No. 6814.

District Court, E. D. New York.

Feb. 13, 1934.

Cooper, Kerr & Dunham, of New York City (C. Blake Townsend and Sturges S. Dunham, both of New York City, of counsel), for plaintiff.

Clyde A. Norton, of New York City (M. Theodore Simmons, of New York City, of counsel), for defendants.

BYERS, District Judge.

The plaintiff, as assignee of the patentee, sues in equity for infringement of Flick United States patent No. 1,526,127, issued February 10, 1925, application filed July 10, 1923, for "Coating Aluminum Articles." The claims involved are numbers 5 and 10, namely:

"5. The process of coloring the surface of aluminum, which comprises providing the aluminum with an absorbent and adherent *(electrolytically produced) coating of oxide of aluminum and treating the aluminum with a lake-forming dye."

"10. An aluminum article having on its surface a dense, absorbent and adherent *(electrolytic) coating of aluminum oxide combined throughout its depth with a lake-forming dye, the coating being resistant to abrasion and to injury by bending the article."

*Result of disclaimer.

The changes indicated by parentheses were embodied in a disclaimer filed on or about May 27, 1933.

The trial began on June 19, 1933, and closed on June 30th. Argument was had on October 30, 1933, and thereafter the minutes were corrected and final briefs filed.

The purpose of the patent, so far as the process is concerned, is to color aluminum by creating electrolytically, on the surface of the metal, a film into which dye is introduced; the result of the operation of the process is that the metallic surface of the metal is overlaid by a coating which is a combination of the aluminum itself with nascent oxygen electrolytically liberated at the anode of an electric circuit, which anode is the aluminum object itself, and this coating accepts dye of the character referred to in the patent.

That the metal when so colored is rendered widely adaptable for commercial use not previously deemed appropriate, is obvious.

Both parties practice the same process, and the differences, if any, are stipulated to be unimportant; that is to say, an electrolyte composed of about 7 per cent. of sulphuric acid in water is used, and the article upon which the film is to be formed constitutes the anode, and the container of the electrolyte is the cathode in the circuit; an electric current of about 12 to 15 volts, having a current density of from 15 to 18 amperes per square foot of exposed surface, is applied for about forty minutes; the film is

thereby created, and the anode is then detached from the circuit, rinsed in clear water and immersed in a coloring solution composed of organic dye in water solution, for such time as may be required—from one to fifteen minutes—depending upon the shading desired of a given color, and the dye solution is maintained at a temperature of from 30° to 60° C.

That the practice of the parties is substantially similar was conceded, and what has been said paraphrases the testimony as to the plaintiff's methods; the defendants' practice is not the subject of testimony on the part of any one who has observed it.

The most important issue in the case is whether the sulphuric acid electrolyte, and the current density applied in connection therewith, are within the teaching of the patent.

The defendants argue that, if such practice is within the teaching of the patent, the latter is invalid, for want of invention. If not, that they do not infringe.

In order to understand the principal issue, the Flick patent must be explained.

The recital states that the invention relates to the coating of aluminum, and that the invention has to do with coated aluminum articles, and with a process for coating them; namely, aluminum as such and finished articles fabricated therefrom. Reference is made to the ready acquisition by aluminum of a superficial film of oxide, and that such films or coatings have been proposed for various purposes, such as protection against corrosion, electric insulation, etc., and that the coatings theretofore known were unsatisfactory; the deficiencies are pointed out, namely, lack of adherence, resulting in ready scaling or breaking off of the film from the articles, particularly upon bending, and the patentee says that he has found that such oxide coatings are incapable of being satisfactorily colored because of being thin and non-absorbent.

Flick sought to provide a commercially practical process for forming on aluminum articles a dense, absorbent and adherent coating of aluminum oxide, combined with a coloring substance, which coating is resistant to abrasion and does not crack or peel off upon bending, and is combined throughout its depth with a dye.

In the practice of his invention, so far as the coating or film alone is concerned, the article is employed as an anode in the electrolysis of an aqueous solution containing ammonia, and preferably also ammonium sulphide; the electrolysis of the electrolyte being effected in an electrolytic cell suitable in size and in current capacity to the requirements.

The amount of ammonia or ammonium sulphide in the electrolyte may vary from 2 per cent. to 25 per cent., and the variations are discussed.

The patentee goes on to discuss the voltage required for forming the kind of film desired. He says that satisfactory coatings have been produced with a current density as low as three and as high as twenty-five or more amperes per square inch of the article being coated, and that it is customarily so high that heating of the electrolyte solution cannot be avoided without resort to artificial cooling.

He describes how the article sought to be coated is first cleansed and then made anode in an electrolytic cell containing "* * * an electrolyte such as explained. It has been found by way of a specific example, that by using as the electrolyte an ammonium sulphide solution of the proportions stated, and by using anode and cathode areas of six square inches each, and a potential difference of two hundred and twenty volts between the electrodes, the initial current density is twelve amperes per square inch, and a very satisfactory coating of aluminum oxide is completely formed on the anode article in from one to two minutes. Under these conditions the current density falls off rapidly as the coating is formed and is only about 2.5 amperes per square inch at the end of two minutes."

The aluminum oxide coating so formed is then described as to its appearance and physical qualities.

An advantage of the process, according to the patentee, is the rapidity with which the coating is formed, "whereas in the formation of inferior oxides by the prior art processes extended periods of time may be required."

Coming now to the coloring aspect of the process, the patentee says that his invention contemplates a colored coating for aluminum articles. Incidental to the process that has been explained, different colored coatings may be formed, depending upon the particular electrolyte solution used, and upon the constituent elements which form an aluminum base alloy to be coated. He says: "The use of an electrolyte containing ammonium sulphide gives a coating which is bluish-gray in color. When the article being coated is

an aluminum-copper alloy, the coating usually has a decided greenish tinge. By omitting the sulphide from the electrolyte solution, a light cream-colored coating is produced."

He goes on to say that the coating produced by the process is absorbent, which permits permanent dyeing of the coating to produce a wide variety of colors. "There are many dyes, usually acidic in nature, which combine with aluminum hydroxide to form an aluminum salt of the type known as a 'lake.'" Flick says that he has discovered that such dyes may be combined with or absorbed on this oxide coating, either during its formation by adding dye to the electrolyte, or after formation by immersion of the coated article in a solution of a dye. He gives an example of an ammonium sulphide solution to which benzopurpurin is added, which produces a shade of red, while logwood extract added to the electrolyte gives a blue coating, and cochineal a pink coating, etc., " * * * it being understood that by the proper selection of suitable dyes almost any desired color of coating may be produced."

When the dyeing is accomplished in the second operation after the coating has been formed, the combination of a dye with the oxide coating may be facilitated by "heating the dye solution to form from about 50° to 80° C." On this subject, the specification reads: "Reference has been made to dyes which combine with aluminum hydroxide to form an aluminum salt known as a 'lake,' and it has been explained that such dyes may be used to color the oxide coating of an aluminum article. Although lakes are commonly formed by combination with or absorption of dyes by a wide variety of inorganic substances, the lake-forming dyes contemplated by this invention are only those which can combine with or be absorbed by aluminum oxide such as is formed by the process herein disclosed." Further Flick says: "I have described the principle and characteristics of my invention together with the preferred manner of practicing it and several variations and modifications thereof. However, I desire to have it understood that, within the scope of the appended claims, the invention may be practiced otherwise than specifically described herein."

Then follow eleven claims, of which but two are here in issue.

While the purposes of the patentee as so disclosed were broad enough to comprehend the coating or film as an end in itself, and therefore to require appraisal as a contribution to a branch of knowledge in which there was already much learning, the more definite purpose of providing a process whereby aluminum and aluminum articles might be colored was clearly and definitely asserted, and marked an advance in territory which had not been explored, much less appropriated; there had been one or two indifferent incursions into it, as will be seen; but the objectives were indefinite or incidental to other purposes.

The limited construction which the defendants would apply to Flick's patent would confine the process to the use of an ammonium sulphide, or ammonia electrolyte, and the article to one which had been colored by that process, and that alone.

From what has been said concerning the practice of the parties, it appears that very much less electric current is employed in connection with the sulphuric acid electrolyte than the patentee found in his specific example, wherein the ammonium sulphide electrolyte was employed. It appears from the testimony that sulphuric acid is much cheaper as an article of commerce than ammonium sulphide; consequently, if there were no other reasons for the present practice—which there are—motives of economy would explain the adoption of the sulphuric acid electrolyte.

In the first place, it will be noted that the process as described in claim 5 does not mention the nature or character of the electrolyte to be employed; as the claim has to do only with an electrolytically produced coating, the language of the claim must be considered in connection with the quoted statement of the specifications immediately preceding the claims, concerning the patentee's intention to practice his invention otherwise than as described—within the scope of his claims.

The plaintiff argues that the proclaimed purpose is broad enough to comprehend the sulphuric acid electrolyte, because an *aluminum oxide* film is the result of the electrolysis induced in the electrolyte so constituted.

This, the defendants deny.

The course of the defense has not always been easy to follow, but the foregoing statement has been relied upon, in one guise or another, throughout the entire case; if a definite answer to that contention can be given, the controversy will be brought into sharp focus, because, if both electrolytes (the ammonium sulphide and the sulphuric acid) so function that an aluminum oxide is

formed at or on the anode, the one may be the equivalent of the other for present purposes.

The plaintiff's witnesses Frary and Fink testify without equivocation that the film produced by the plaintiff both in its uncolored and colored forms, and the colored film as produced by the defendant are *substantially aluminum oxide*, the chemical symbol of which is $Al_2O_3$. This conclusion is based upon two experiments known as the X-ray diffraction test and the U-tube test, which do not involve chemical reactions, but physical processes. The first consists in the X-ray identification of the pattern of $Al_2O_3$ in its crystalline form, the crystallization being accomplished by the employment of heat of approximately 1000° C, as the result of which characteristic patterns have been recognized. This may be roughly likened to thumb print identification in less recondite altitudes, and is said by these witnesses, and other scientific investigators, to be precise.

The U-tube test had for its object, through the alternate application of heating and cooling to the film, after it had been isolated, the identification of the $H_2O$ content, which was so small (not to exceed 5%) as to point to the inevitable conclusion that the film was not aluminum hydroxide $(Al(OH)_3)$ but aluminum oxide $(Al_2O_3)$. Dr. Frary further fortified his opinion by the reaction of the film to dyes, which, as the result of an inductive process, led to the same result. These together constitute affirmative evidence to which the defendants oppose no proof whatever, apart from the expression of opinions. Their witnesses somewhat question the X-ray diffraction and U-tube tests, but they offer no tests of their own to establish the affirmative of the proposition that the coatings are really substantially aluminum hydroxide, or are not substantially aluminum oxide.

To state the situation concretely, the defendants' witness Handy testified on direct and re-direct to the extent of about 132 pages; the witness Professor Collin G. Fink testified on direct and re-direct for about 97 pages; the defendants' main brief is of 79 pages; its reply brief is of 15 pages; its epistolary supplements are of 4 pages. All of these observations, taken together, contain no affirmative evidence, but merely the expression of opinion, as to the chemical constituency of the film or coating which results from the electrolysis incident to the use of the sulphuric acid electrolyte.

Thus the court is asked to disregard the affirmative evidence of the plaintiff, not because it is met or overborne by defendants' evidence, but because the defendants consider plaintiff's demonstrations unconvincing. Agreement with such views could be based only upon that which the court does not profess to possess, i. e., an insight into the scientific verities of the controversy.

Mention should be made in this connection, in fairness to the defendants, of Mr. Handy's two affidavits made in behalf of a motion to reopen; in these he refers to investigations conducted by him since the trial, which he describes in detail, leading to the conclusion that the film or coating resulting from the use of the sulphuric acid electrolyte is aluminum sulphate, although at the trial he was " * · * * sure it contains a substantial amount of aluminum hydroxide," i. e., the predominant constituent. Later he said that there was, in his opinion, some aluminum combined with sulphur anhydride, derived from the sulphate of the bath.

If those affidavits be accorded the status of testimony, the result is that either the statement at the trial has been fortified, or that it has not. If that which is stated in the affidavits represents a new point of view, based upon further research, it should not be minimized on that account, nor has it been.

The demonstrations upon which it is based are quite minutely criticised in opposing papers, of which more will be observed. Presently it is noted that this is all that approaches affirmative testimony upon which the opinion of this witness is based.

The most recent version of the defendants' theories is to be found in the said motion papers received just before the final argument, in which Mr. Handy deposes that, during the month of September, 1933, he completed certain experiments which convinced him that the coating produced by the defendants is not an aluminum oxide but is a chemical compound which he does not completely identify. That affidavit was offered in behalf of a motion to reopen and take further testimony on the part of the defendants, and the application was opposed by the plaintiff, in the form of an affidavit of Dr. Frary and one of Harry V. Churchill, to which a reply affidavit was filed by Mr. Handy. The disposition of that motion will be hereinafter stated; the present reference has to do solely with the most recent embodiment of the defendants' contention, respecting the constituency of the coating or film, as both sides cause it to be formed.

The question of the chemical composition of the film which is formed by electrolytic action at the aluminum anode, a sulphuric acid electrolyte being employed, has engaged the attention of chemists for many years, and as long ago as 1899 was discussed at length in a paper in evidence, prepared by one Konrad Norden, entitled "The Phenomenon (Process?) at the Aluminum Anode"; as recently as 1930 the plaintiff's witness Dr. Frary was of the opinion that the film was properly to be described as composed of aluminum hydroxide, and this opinion on his part yielded two years later to his views expressed at the trial [that it is substantially aluminum oxide ($Al_2O_3$)] as a result of the X-ray diffraction test and U-tube test above referred to.

In the face of changing scientific opinion, naturally this court has not the temerity to announce a conclusion on the subject; all that can be stated is that which would apply to any issue submitted for adjudication, namely, that the preponderance of testimony in the record points to a certain conclusion. In the absence, therefore, of affirmative demonstration, on the part of the defendants, which could be weighed against that described for the plaintiff, it must be held that the plaintiff has gone far to sustain the burden of proof on this issue.

The office of the electrolyte may somewhat throw light upon the extent to which the patent may be either closely or broadly construed in this respect.

The experts agree in stating that what happens when the circuit functions is that the substance which is added to the water (a poor conductor) generates the medium of conductivity; or, as the witnesses have it, the (negative) ions liberated in the electrolyte so function; and the high affinity of aluminum for oxygen results in the formation, at the anode, of a combination of the aluminum with the nascent oxygen of the water, which in part is decomposed by the electrolysis.

Thus the negative ions released by ammonium sulphide in the one case, and the sulphuric acid in the other, may be likened somewhat, in profane parlance, to a lead pipe or a copper pipe, carrying a stream or current from one place to another; and, if it is the action at the delivery point of that which is borne, rather than any contribution by the medium of transportation, which is vital to the process, the constituency of the carrier may be regarded as relatively unimportant in the accomplishment of the desired purpose.

The chances are that the problem is not as simple as the foregoing might be thought to indicate, because what actually takes place, in the operation which results in the formation of the film on the anode, is very largely a matter of theory; the process is set in motion, and the result is observed, but whether the explanation of all that takes place, whereby the result is brought about, is completely true will perhaps not be known with certainty without further research.

The precise difficulty with this branch of the case has to do with the extent to which the elements present in the electrolyte may influence or determine the constituency of the film. There seems to be a recognizable proportion of sulphur present, but its actual residence and character are much disputed.

The patentee, for instance, referred to the different colors of the film itself when various electrolytes were employed, and, when the question was asked of Dr. Frary to explain how it is that aluminum oxide is created at the anode whether the ammonium sulphide was employed or the sulphuric acid, his answer embraced the philosophy of the reaction, as he expounds it, with reference to the sulphuric acid electrolyte, and continues in part: "Now, in the case of ammonium sulphide electrolysis, we apparently get the same thing, and I think that the same thing is true in the case of the electrolysis of chromic acid, oxalic acid, phosphoric acid, and boracic acid, which I have already mentioned."

The answer continues to explain the incidents which are common to the process when other acids are used such as phosphoric and boric, and in this respect his conclusion seems to be in accord with what is said in an affidavit constituting an exhibit in the case, filed by L. C. Pan, the originator of the defendants' process, in which he deposes that ammonia and ammonium sulphide are but two of the many electrolytes that may be and have been used for providing an oxide coating upon aluminum even when the film is to be dyed. Other such electrolytes are chromic acid, ammonium borate, sodium silicate, sodium chromate, borax, sulphuric acid, etc.

That there is a distinction, in chemical aspect, between the two electrolytes, admits of little question, because the ammonium sulphide solution gives an alkaline reaction,

and of course the sulphuric acid gives an acid reaction; also the current density employed with the former greatly exceeds that used in the latter process, but, if both so function that there results the formation, at the anode, of a film which is substantially aluminum oxide, and that film possesses the same physical characteristics in both cases, no good reason appears for seeking to limit the claims of the patent by holding that the sulphuric acid electrolyte is not to be regarded as within its teaching. Authority for this view is to be found in the cases of United Nickel Co. v. Pendleton (C. C.) 15 F. 739; Electric Smelting & Aluminum Co. v. Pittsburg Reduction Co. (C. C. A.) 125 F. 926; Tilghman v. Proctor, 102 U. S. 707, 26 L. Ed. 279.

The defendants cite Cochrane v. Badische Anilin & Soda Fabrik, 111 U. S. 293, 4 S. Ct. 455, 28 L. Ed. 433. If that decision is understood, it is to the effect that the defendant's article was not produced according to the plaintiff's process. But the evidence in this case is that there is substantial identity between the coatings or films, as produced by the plaintiff and each defendant.

In concluding this branch of the case, reference should be made to the fact that certain of the earlier patents, relied upon by the defendants to establish lack of invention, indicate the use of both acid and alkaline electrolytes indifferently; from which it is deduced that either character of electrolyte is regarded as equally available for the desired electrolysis.

Another reason urged why the sulphuric acid electrolyte should not be construed within the patent is that the current density employed with it is very much less in volume than in the case of the ammonium sulphide electrolyte. This is not believed to affect the principle involved. The current density may be likened to the power required to operate a given mechanism, and surely, if the patentee, in the application of his conception, develops an instrumentality which may be operated with less power than his first experiments required, he is entitled to the benefit thereof without being held to have departed from his original conception. Tilghman v. Proctor, 102 U. S. 707, 26 L. Ed. 279.

Passing to the question of validity, the most recent position of the defendants, as disclosed in their reply brief filed November 1, 1933, seems to be that Flick was probably a pioneer in providing means for producing

a coating of aluminum oxide on the surface of aluminum articles and in dyeing it, although the statement is argumentative in form.

This is in accord with the testimony of the defendants' expert Professor Fink, for he said that, if it could be demonstrated that there is present in the Flick film preponderatingly, $Al_2O_3$, then in his opinion Flick invented something. As has been stated, the positive evidence in this record is believed to demonstrate that such was Flick's accomplishment.

It is not contended that the Flick patent was anticipated.

The defendants' prior art citations (there were none by the Examiner in the Patent Office) should be briefly considered, in case the court has misunderstood defendants' present position concerning invention.

*The Norden article,* written in 1899, is a discussion entitled "On the Phenomenon (Process?) at the Aluminum Anode. (A contribution to the Electrochemical Transformation of Alternating Current into Direct Current)," and, in that connection, discusses the use of a sulphuric acid electrolyte in connection with the polarization of aluminum. The investigations in this field recorded by earlier writers are summarized, in connection with an exploration of the subject of the article; in the course of from sixty to seventy pages of discussion, much is said concerning the composition of a film such as is created on the aluminum anode by the use of a sulphuric acid electrolyte. The writer concludes, among other things, that: "The oxygen secondarily produced by the decomposition of the sulphuric acid, with the co-operation of the water of the electrolyte, produces upon the aluminum of the anode a layer of $Al_2(OH)_6$ *(sometimes rendered $Al(OH)_3$). In the beginning this is dissolved in a purely chemical way by the surrounding sulphuric acid; * * * so that in the whole process a molecule of aluminum sulphate is produced which with the previous one may react upon the new hydroxide of the film."

*Parenthetical addition by court.

Incidentally the criticism of this conclusion, by the plaintiff's witness Frary, was not attacked on his cross-examination.

In other words, this treatise was not directed to the question of the formation of such a film for the purpose of coloring it and thereby producing a colored aluminum article.

This article contains the following statement: "It will be seen from this that the differences between the individual experiments are small, from which the following law may be derived: the current density has no influence upon the chemical nature of the coating."

While the foregoing is stated with reference to a sulphuric acid electrolyte, it is not without interest in connection with the defendants' contention on the subject of current density, which has been referred to. The most that can be said for the article in the present connection is that the use of sulphuric acid as an electrolyte for the formation of such a film as is here involved was known to Norden many years before Flick sought his patent, and one way of testing whether that fact proves that he made no invention would be to consider whether, if Flick had used as one of his specific examples a sulphuric acid electrolyte as well as an ammonium sulphide electrolyte, his patent would have been granted. There is nothing in the file wrapper to indicate that it was suggested to him that any limitation of the kind of electrolyte must be embodied in one of the claims, or that the subject had been considered in connection with his application.

A reading of the Norden article suggests that the sulphuric acid electrolyte was not novel in the creation of electrolytic films; but equally there is nothing in the Norden article to suggest that a film having the physical characteristics of the Flick film, and so evolved, could be dyed for the purpose of producing colored aluminum, and that was the contribution that Flick made to human knowledge.

The Mott article (Defendants' Exhibit SS) is an article written by William Roy Mott in a magazine called "Electrochemical Industry," in November 1904, which opens with the statement that engineers and inventors have repeatedly emphasized the importance of selecting the proper electrolyte for use with the aluminum electrolytic rectifier and condenser. He discusses the composition of the film and offers certain observations which were doubtless believed by him to be true; among others, is this statement: "Since, however, different electrolytes produce films of vastly different character, a difference of composition in the films is expected with each electrolyte." It will be noted that the writer refers to an expectation; the evidence in this case deals with a finding. Further, this statement should perhaps be compared with the most recent exposition of the theory of the electrolyte as related by Professor Fink: that the electrolyte is the acid, salt, or alkaline solution; by which is understood, the act of going into solution on the part of the substance added to the water.

No conclusions are announced which go to the question of producing an electrolytic film of certain characteristics and then coloring it for the purpose of producing colored aluminum.

*Saint-Martin French patent No. 440,516 (1911)*—The patentee claims a new product which is aluminum oxidized in a "deep layer" and process for the obtaining of this oxide of aluminum, and the application of this oxidized and bare aluminum as an insulated electric conductor.

The electrolyte disclosed contains sulphuric acid and iron sulphate. "The cathode is of iron in order to be soluble in the electrolyte."

Enough has been said to indicate that the inventor had a special purpose not even remotely resembling that of Flick.

*Mershon U. S. patent No. 1,065,704 (1913)*—The patent is entitled "Film-coated Metallic Article and Method of Making the Same." The object of the patent is to provide articles having an electrolytically produced film, firm and dense, possessing a temperature resistance, such as cooking utensils which are enabled to resist heat by reason of the presence of the film; and, in the electrical arts, a conductor having such a film. The inventor describes in detail how he produces the film through electrolytic action, and he acidulates the bath by using boric or phosphoric acid, etc., and borax. He says that the film produced is exceedingly thin but possesses marked durability. There is no mention in the patent of dyeing the film so that an article so coated and dyed is colored aluminum. There is nothing to suggest that Mershon had this possibility in mind.

When one of the defendants' experts testified that he had dyed the Mershon film, it scarcely proved that Mershon taught coloring of aluminum, which is the activity practiced by both the plaintiff and the defendants. This court is not satisfied that the Mershon film has been satisfactorily colored; but if this is a mistaken view, there seems to be no reason to suspect that either the plaintiff or the defendants practice the Mershon patent.

*Collins U. S. patent No. 666,262 (1901)*—This is entitled "Process of Making

Paint." The object of the invention is to insure a better union between soluble coloring matter such as coal tar or anilin dyes, and the body with which they are united to form a paint, to secure permanence and durability. In the specification he states that he is aware that insoluble oxids have been produced on the surface of an anode by the action of free oxygen liberated by electrolysis, and that various dyes have been introduced into the liquid surrounding the anode for the purpose of coloring the oxid thus chemically produced by secondary reaction. The claim is for the process of making pigments, which consists in producing a solution of barium dithionate, introducing into the same a dye salt, passing an electric current therethrough, thereby subjecting said mixture to electrolytic dissociation, and precipitating a barium sulphate together with the dye salt substantially as described.

With reference to the above quoted observation, Collins says that "the production of such oxid upon the anode is purely superficial and cannot be carried on to any considerable extent, as the superficial coating of oxid eventually prevents further action and naturally cannot be considered a commercial process." In terms, this would seem to be a repudiation of that which Flick accomplished. Collins precipitated a pigment; he did not teach a film and its coloring in order to produce colored aluminum.

*Lang U. S. patent No. 1,077,480 (Applied for in 1907)*—This is entitled "Process for the Treatment of the Surfaces of Articles of Aluminum." The recital refers to the employment of aluminum in the manufacture of sundry articles, and to the fact that the metal possesses many disadvantages on account of its low melting point and lack of hardness; the formation on the metal of an oxid coating has been considered impracticable hitherto on account of the weak affinity of aluminum for acids and alkalies. Consequently coatings of other materials have been applied. He says:

"It has been proposed to color the layers of carbon deposited on the aluminum surface with metallic coloring matters, but of course this coloring is only incorporated with the external covering layers, and is not therefore firmly applied to the metal.

"According to the present invention it is possible to form an oxidized coating or layer on the aluminum, this layer having good fire-resisting properties while it is permanent and can if desired be colored or enameled; the layer of color does not rest loosely on the material but becomes permanently bound with the oxidized layer."

He goes on to say that the oxidation may be effected by the use of alkali, hydrochloric acid, or metallic chlorids in solution, which latter at the same time produce a colored deposit.

The process of producing the coating is chemical; that is to say, the article is dipped in a solution of alkali, hydrochloric acid or the like, and the article is subsequently heated to a red heat whereby the chlorin is driven off, leaving a hydrate of aluminum, which is reduced to the oxid on further heating.

The claims are for the described method of treating the surface of aluminum with an oxidizing salt, or with metallic chlorid, and subjecting the coated aluminum surface to the action of heat.

Lang plainly suggests in his specifications the coloring of aluminum by introducing coloring matter into an oxid layer formed by chemical reaction, and this patent is perhaps not entirely unrelated to the disclaimer filed by the plaintiff.

Lang did not teach a coating formed as the result of electrolysis; nor is it apparent that he was sufficiently conversant with the necessary qualities and physical characteristics of the film to suggest the conclusion that he had in his mind a definite plan or purpose to impart all that Flick presents; nor does Lang represent that he has colored the oxidized coating so as to produce a permanent, durable and commercially practicable process for coloring aluminum. The most that can be said for this patent is that Lang regarded a coloring process as possible, while Flick demonstrated that it was practicable. The defendants are not practicing the Lang patent, and their chief reliance upon it is to minimize the accomplishments of Flick. The latter at least made a definite advance over Lang, in that he devised a film which is entirely adequate to accomplish the result of coloring aluminum, and his process and his product were not taught by Lang.

*Lang U. S. patent No. 1,082,161 (Applied for in 1909)*—This patent is entitled "Protecting Iron from Rust." The invention is described by the patentee as a process for dyeing permanently iron and steel by means of dye-stuffs stable to acids and alkalis, forming superficial chemical combinations with the metal previously prepared. Of the eight claims all but two specifically have to do with coloring iron and steel; the remaining two refer to a metallic object but no mention is made of aluminum.

*Lang German patent No. 163,545 (1905)* —This is described as a "Process for the Oxidizing and Coloring or Enameling of Aluminum Objects after Treatment with Mercury ·Compounds." He says that his process makes it possible to produce a durable, fire-resistant oxidation layer, which can be colored by chromium or other easily reducible compounds. The process is a chemical one and involves the application of a mercury compound, such as mercuric chloride; the oxidation process thus set up is stopped by annealing, so that there is produced a coating of aluminum oxide which can serve as basis for the enameling of the aluminum or to which may be applied, during the oxidation, solutions of chromic acid or other chromium compounds or similar easily reducible substances. The patent claim is for such an oxidizing and coloring and enameling process of aluminum objects as described; that is to say, the oxide layer is colored by easily reducible compounds which "form a colored deposit, for instance chromium compounds, and are fixed by annealing or provided with an enamel coating."

*Lang German patent No. 186,910 (1906)* —This is said to be a process "for the oxidizing and coloring or enameling of aluminum objects by the action of acids and alkalis," and is an addition to the patent last above referred to.

Apparently the new development was the result of experiments in which it was found that the oxidation of aluminum can be started by previous treatment "with hydrochloric acid, alkalis, for instance, potassium hydroxide solution, etc., and that the coloring of the oxide layer can be effected by substances which enter into chemical compounds with the aluminum oxide, the so-called color lakes." The claim is for the manner of execution of the process in his German patent No. 163,545, "by the action of acids and alkalis having the distinctive feature that the oxidized surface of the metal is colored by substances which enter into combination with the oxide layer, or are converted by oxidation into colored precipitates." This again is a chemical process, which is not practiced by either party to this case.

*McKenzie U. S. patent No. 554,718 (1896)*—This is entitled "Process of Producing Lakes or Coloring Compounds by Electrolysis." The claim is for the method of producing lakes or insoluble pigments or paints consisting in placing in suitable liquid the fundamental bases of coloring-matters, then subjecting the solution to a current of electricity applied by means of electrodes retained in contact with the liquid, the anode being composed of oxidizable metal, and then separating the lakes or pigments from the menstruum.

McKenzie was producing a pigment and Flick was producing an electrolytic film of certain definite physical characteristics, capable of receiving coloring matter for the purpose of coloring aluminum. Neither party is practicing McKenzie's invention.

The most that the defendants urge on behalf of McKenzie is that, if he had stopped the operation of his process before complete disintegration of the anode, he would have had a dyed anodically coated aluminum article, but of course McKenzie did nothing of the kind. He used an aluminum anode for the purpose of consuming it in the process of producing a color lake, i. e., a combination of aluminum oxide with coloring matter in the form of a precipitate, which he used as a pigment. Flick colors the electrolytic film with a lake-forming dye and produces colored aluminum as an end in itself.

This review of the prior art shows that Lang was the only other person who apparently had the idea of coloring aluminum, but his process is not electrolytic and his film does not possess the characteristics shown to be present in the Flick film and, so far as the testimony in the case indicates, no attempt has been made commercially to follow Lang's teachings; nor does it appear that Lang himself produced anything which would be acceptable in the commercial sense. Assuming that Lang and Flick entertained a common purpose, it has not been shown that Lang succeeded, and it has been shown that Flick did, and it has not been shown that Flick availed himself of anything that Lang taught.

Reference should be made to the fact that the defendants offered in evidence sundry pieces of aluminum said to have been coated, respectively, by one or the other of the processes disclosed in some of these patents, which coatings were dyed. From this, they reason that the Flick film is quite conventional in the art, and that the coloring of such coatings was an inevitable thing, and to do so was so obvious that no invention was involved in the doing of it.

In the first place, no one but Lang ever suggested it. He did not perfect the process, nor render it commercially practicable. That it was not obvious, results from the testimony that, for many years, a satisfactory

coloring process for aluminum had been sought in vain. That testimony was not denied.

Finally, no film or coating of the cited patents has been demonstrated to be adequate for the purpose accomplished by Flick.

If the defendants' witnesses had found it convenient to analyze the undyed coating on one of the samples appearing in the defendants' "Coloral" booklet, and to state plainly what the analysis disclosed, the testimony would have been quite helpful.

It is concluded that the prior art does not reveal anything which deprives Flick of invention.

The defendants object on the further ground that the patent is invalid for indefiniteness, in that the dyes contemplated by Flick are not specifically indicated. The expression used is "lake-forming dyes," which was suggested by the Examiner in the Patent Office, in the following language: "It is thought that the claims should be restricted to the type of dyes which form aluminum lakes." And accordingly an amendment was adopted so as to clarify the subject in the specification, and in sundry claims, including number 5.

The defendants cite Metals Recovery Co. v. Anaconda Copper Min. Co. (C. C. A.) 31 F.(2d) 100, and Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U. S. 358, 48 S. Ct. 380, 72 L. Ed. 610. Those cases have been examined and the opinions indicate that there was an abundance of testimony, in each case, that the terms employed were too nearly generic to indicate, with fair precision, the dimensions of the patent disclosure.

There is no such testimony in this record. The term "lake-forming dye" seems to have presented no obstacle to either of the defendants' witnesses. There is no suggestion in the deposition of either, that chemists reasonably skilled in the art of using dyes would be at a loss to select a lake-forming dye, in order to follow Flick's process.

The defendants' witness Professor Fink said: "That is a thing that is pretty well known, the combination of aluminum hydroxide with a dye to form a lake, an insoluble compound." He submitted a reference (Defendants' Ex. EE) in which there is an allusion to the formation of lakes.

It is concluded that Flick's patent is valid as to both the process and the article.

Little need be said on the subject of infringement, although the defendants' argument has been carefully considered, to the effect that, in using the sulphuric acid electrolyte with its attendant low current density and voltage, they are following in the footsteps of persons whose inventions, discoveries or practices were public property long prior to the date of the Flick application.

If the defendants were practicing the Lang, Collins, McKenzie or Saint-Martin patents, the argument would be sound, but they are not. They are practicing Flick, and using such an electrolyte as comes within the scope of his patent. The Norden article does not change this conclusion, because that writer did not teach anything concerning the physical characteristics of a film which would be adapted to the receipt of a coloring agent, with the object of coloring aluminum. He merely analyzed the film resulting from the use of the sulphuric acid electrolyte, and it may be doubted whether his methods in reaching his conclusion would entitle it to contemporaneous validity.

The fact has not been adverted to that the plaintiff's patent is one subject of a large number of licenses (apparently there are others in the series) which are yielding revenue to the plaintiff, for the reason that such acquiescence in the plaintiff's patent is merely one element of the entire situation.

In a recent case, Du Pont De Nemours & Co. v. Glidden Co., 67 F.(2d) 392, 395, in the Circuit Court of Appeals for the Second Circuit, this expression is used:

"Moreover, the patent has been recognized by fifty-two manufacturers who have taken licenses. True, this must not be pressed too far; it is easier to pay tribute than to fight, and a substantial part of the trade has combined in this contest. But courts have always treated such recognition as a relevant consideration and certainly it may not be altogether disregarded. Thropp's Sons Co. v. Seiberling, 264 U. S. 320, 329, 330, 44 S. Ct. 346, 68 L. Ed. 708."

As to the motion to reopen, a careful examination of the motion papers discloses that the defendants still offer no complete or convincing affirmative showing as to the chemical constituency of the film resulting from the use of the sulphuric acid electrolyte. Whether this reticence is calculated or fortuitous, the result is that no sufficient showing has been made to justify prolonging expert controversy upon an abstruse subject. By stipulation of counsel, the various affidavits are to be included in the record for the benefit of a reviewing court, and consequently the motion will be denied.

It is concluded that the plaintiff is entitled to the usual decree against the defendants, including an accounting for profits, but, in view of the disclaimer, costs do not follow.

Settle findings and decree on notice.